UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Bruce Bolinsky,                                              Case No.  3:17-cr-374

        Petitioner–Defendant,

        v.                                                   MEMORANDUM OPINION
                                                                    AND ORDER
United States of America,

        Respondent–Plaintiff.

## I.    INTRODUCTION

Petitioner Bruce Bolinsky filed a motion for relief under 28 U.S.C. § 2255, asserting his

sentence should be vacated because he allegedly received the ineffective assistance of trial counsel.

(Doc. No. 138).  The government opposed Bolinsky's motion, (Doc. No. 147), and Bolinsky filed a

brief in reply.  (Doc. No. 148).  Bolinsky subsequently filed a motion for the appointment of

counsel, (Doc. No. 140), a motion to expand the record, (Doc. No. 154), and a motion to

supplement and amend his § 2255 motion.  (Doc. No. 158).  The government opposed Bolinsky's

motion to amend but did not respond to his motions for counsel or to expand the record.  (Doc.

No. 160).  Bolinsky then filed a supplement to his § 2255 motion and a reply brief in support of his

motion to amend.  (Doc. Nos. 161 and 162).  For the reasons stated below, I deny each of

Bolinsky's motions.

## II.    BACKGROUND

On September 13, 2017, Bolinsky was charged by indictment with one count of receipt and

distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2) in connection with internet

activity occurring from on or about November 26, 2015, until on or about August 26, 2016. (*See* Doc. No. 1). Bolinsky appeared at his arraignment with his retained attorney, Jerome Phillips, and pled not guilty. (*See* non-document entry dated September 26, 2027). On January 9, 2018, at the parties' request, I set a jury trial to begin on May 21, 2018. (Doc. No. 10). Less than two months later, Bolinsky hired another attorney, Joseph Patituce, and Phillips withdrew as counsel. (Doc. Nos. 11 and 13). I then vacated the May 21, 2018 trial date at Bolinsky's request. (Doc. No. 15). Discovery continued and, on October 5, 2018, at the parties' request, I reset the jury trial to begin on March 12, 2019. (Doc. No. 19).

Approximately a month later, Bolinsky again retained new attorneys, Steven Crossmock and Stevin Groth, and Patituce withdrew as counsel. (Doc. Nos. 20 and 21). On December 13, 2018, I vacated the March 2019 trial date at Bolinsky's request and rescheduled it to begin on April 30, 2019. On April 1, 2019, Bolinsky again requested that I vacate the trial date so that his attorneys could identify and hire an expert to assist them in their review of the evidence. (Doc. No. 27). I again granted his request and rescheduled the trial to being on August 27, 2019. (*See* non-document order dated April 16, 2019).

In the ensuing months, the parties worked on joint proposed jury instructions, exchanged witness lists, and finalized exhibit lists. During a pretrial conference held on August 8, 2019, defense counsel indicated they intended to object to the images and video clip included in the government's composite exhibit to be shown at trial. I held a preliminary hearing on August 16, 2019, where defense counsel objected to the government's composite exhibit pursuant to Federal Rule of Evidence 403, arguing the probative value of the contents of the exhibit was substantially outweighed by the danger of undue prejudice, confusion of evidence, or misleading the jury. (*See* non-document entry dated Aug. 16, 2019).

I concluded the evidence should not be excluded under Rule 403 and overruled the defense objection.  Then, at the government's request, I advised Bolinsky of the nature of the Federal Sentencing Guidelines, the mandatory minimum sentence applicable to the offense with which he was charged, potential enhancements to his Guideline range, and the potential beneficial effects on his sentence of pleading guilty and accepting responsibility.  (*Id.*).  Bolinsky confirmed he intended to proceed to trial.

On August 22, 2019, I held a pretrial conference by telephone at Bolinsky's request after he notified Crossmock and Groth he intended to fire them and that he intended to request that I appoint the Office of the Federal Public Defendant to represent him.  (Doc. No. 52 at 2).  I noted during that conference that Bolinsky did not make any comment during the August 16, 2019 preliminary hearing "about his dissatisfaction of either the level of preparation or expertise."  (*Id.* at 4).  The government objected to Bolinsky's request for new counsel, noting the two prior changes of counsel and the delay in the case resulting from those changes.  I then held an *ex parte* conversation with Bolinsky and Crossmock, excusing the government from the conference to protect any discussion of trial strategy or communications between Bolinsky and his attorney.  (*Id.* at 5-8).

I spoke with Bolinsky and Crossmock for approximately 45 minutes, discussing: (a) Bolinsky's claim that his attorneys were not sufficiently communicating with him; (b) his belief his attorneys did not know what the evidence was against him until August 16, 2019; (c) his disagreement with counsel's level of investigation into the absence of metadata associated with some images and videos found on his computer; (d) his contention that his attorneys and the retained defense expert were not specifically or sufficiently looking into Bolinsky's theory that an unknown person had gained remote electronic access to Bolinsky's computer through one or more of three viruses found on the computer hard drive; and (e) his belief that his attorneys did not sufficiently

understand the technology involved in his case. (*See* Doc. No. 53) (filed *ex parte* and under seal).[1]
Following that discussion, I concluded Bolinsky had not provided "sufficient reasons . . . to warrant
a change of counsel at [that] time." (Doc. No. 52 at 8-9).

The following day, August 23, 2019, Bolinsky notified my chambers that he wanted to plead
guilty, and he consented to a referral of the case to then-United States Magistrate Judge James R.
Knepp II. (*See* Doc. No. 43). During that hearing, Bolinsky waived his right to a jury trial, admitted
he engaged in the conduct charged in the indictment, and pled guilty. (*See* Doc. No. 45). Judge
Knepp recommended I accept Bolinsky's change of plea and find him guilty. (Doc. No. 44).
Neither party filed objections to Judge Knepp's Report and Recommendation. The case was then
set for sentencing on January 23, 2020. (*See* non-document entry dated August 23, 2019).

On January 8, 2020, Crossmock and Groth filed a motion to withdraw as counsel, asserting a
conflict of interest had arisen after Bolinsky accused them of violating Rule 1.2(d)(1) of the Ohio
Rules of Professional Conduct.[2] (Doc. No. 50). The government raised concerns about the
repeated changes in counsel and the attendant delays to the case as a result and discussed, from its
perspective, the extent of Crossmock and Groth's investigation of the case and preparation for trial.
(Doc. No. 57 at 5-8). Crossmock agreed with the government's statements but indicated he and
Groth could not continue on the face following Bolinsky's allegations. (*Id.* at 9). I granted counsel's
motion to withdraw and made a finding that Bolinsky was indigent and could not afford to retain

---

[1] While this transcript originally was sealed to protect Bolinsky's rights at trial, I conclude there is no
further need for protection for those proceedings, as Bolinsky went to trial with new counsel and
raises some of these contentions, as well as substantially similar arguments regarding his trial
counsel, in his § 2255 motion.

[2] Rule 1.2(d)(1) states "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct
that the lawyer *knows* is *illegal* or *fraudulent*." Ohio Prof. Cond. Rule 1.2(d)(1) (emphasis in original).

new counsel.  (*Id.* at 11-14).  I subsequently appointed Donna Grill of the Office of the Federal Public Defender as Bolinsky's attorney.[3]  (*See* non-document order dated January 24, 2020).

Less than two months later, Covid-19 began to spread across the United States.  On March 9, 2020, State of Ohio Governor Mike DeWine declared a state of emergency, and, on March 23, 2020, DeWine issued a stay-at-home order that remained in place to a substantial degree until April 30, 2020, when a phased reopening began.  *See* https://governor.ohio.gov/media/executive-orders/executive-order-2020-24d (last accessed April 25, 2025).  This courthouse closed for in-person proceedings and General Orders issued by the Chief Judge of the Northern District of Ohio prohibited jury trials for much of the next year.

On September 14, 2020, Bolinsky moved to withdraw his guilty plea.  (Doc. No. 61).  I granted the motion and set the case for a jury trial to begin on February 2, 2021.  (*See* non-document order dated Sept. 22, 2020).  On January 13, 2021, I vacated the February trial date pursuant to General Order 2020-08-5, which vacated all jury trials scheduled through April 4, 2021.  (*See* non-document order dated Jan. 13, 2021).  I subsequently reset the trial for August 17, 2021.  (*See* non-document order dated Mar. 18, 2021).

On August 12, 2021, Bolinsky moved to continue the trial in order to address several pressing health issues.  (Doc. No. 88) (filed under seal).  I granted the motion and reset the trial for October 19, 2021, with voir dire to take place on October 18, 2021.  (*See* non-document order dated Aug. 13, 2021).

The jury trial commenced in October as scheduled.  The government's first witness was United States Secret Service Agent Josh Seney, who was then employed as a network intrusion forensic technician at the agency.  (Doc. No. 143 at 35).  Seney previously was employed as the

---

[3]  I appointed a second attorney from the Defender's office as well, but that attorney withdrew as counsel a few months later.  (*See* Doc. No. 58).

detective bureau supervisor in the investigative bureau of the Sylvania, Ohio Police Department. (*Id.* at 36). While employed with the Sylvania Police Department, Seney also was a Task Force Officer on the Joint Terrorism Task Force with the Federal Bureau of Investigation and, later, on the Cyber Investigative Task Force with the Secret Service. (*Id.* at 37).

The images and videos giving rise to this case were identified through a search of a peer-to-peer file sharing network. Seney explained that a user gains access to a peer-to-peer file sharing network through a client software package. (*Id.* at 44). The user's client then can download portions of a file from clients of multiple other users of the same network, allowing the user to download a file much more quickly than if the file came through a single source. (*Id.* at 43-44).

Some client software packages are specific to a single file sharing network, while others can be used to access more than one file sharing network. (*Id.* at 46). The user must identify the client software that is compatible with the file sharing network the user wants to access and then download and install the client software before gaining access to the network. (*Id.* at 47-48). When installing the client software, the user is prompted to select certain settings, including whether other clients may access files downloaded on the user's client. (*Id.* at 49-50). Users may change the client software's settings after installation as well. (*Id.* at 50-51).

Once the client software is installed, the user enters search terms to locate, and select for download, the files the user seeks. (*Id.* at 48). A search scans the names of the files on the network; because file-sharing software "does not index the contents of the data" in the file, file names must be descriptive of the file contents in order for those files to be identified in the search results. (*Id.*). When a search returns results to the user's query, the user must initiate the download process. (*Id.* at 53-54). Downloaded files must remain in a folder that the user has given approval to share data with other users on the file sharing network before those other users may access it. (*Id.* at 51).

Seney testified that law enforcement officers conducting child pornography investigations use client software programs that differs in two ways from the typical client software – the law enforcement tools are only able to download files and do not have the capability to share files with other users, and those tools are set up to perform only single source downloads, so investigators can determine which specific internet protocol ("IP") address shared the child pornography.  (*Id.* at 55). The law enforcement client software also permits investigators to limit their searches by zip code. (*Id.* at 56-57).

In November 2015, Seney identified a single source IP address that was sharing child pornography files.  (*Id.* at 63).  Between November 26, 2015, at approximately 2:41 p.m. and November 27, 2015, at approximately 6:10 p.m., Seney's client software downloaded "32 files of interest" from a file sharing program called Tribler through the peer-to-peer platform BitTorrent. (*Id.*).  Seney reviewed those files and determined they contained images of infants, toddlers, and prepubescent minors with their genitals showing; some of the images showed vagina and anal penetration of the depicted minors.  (*Id.* at 65-66).

Seney then identified the internet service provider to whom the single source IP address was allocated and sent the internet service provider a subpoena to determine which customer was assigned that IP address during the November 26-27 investigative window.  (*Id.* at 67).  Seney learned that IP address was assigned to Diana Vanderhoff at an apartment located on Devonshire Road in Toledo, Ohio.  (*Id.* at 69).  Seney next contacted Secret Service Special Agent Steve Snyder to inform him of the result of his investigation so far.  (*Id.*).  The two began working the investigation together.  (*Id.*).

On August 26, 2016, Seney, Snyder, and another Sylvania Police detective, Steven Papenfuss, went to the two-bedroom Devonshire apartment.  (*Id.* at 69-71).  Once there, they made contact with Vanderhoff and her fiancé, Bolinsky.  (*Id.* at 70; Doc. No. 145 at 45).  Seney observed

numerous electronic devices in the apartment and learned Bolinsky worked in information technology as a computer repairman.  (Doc. No. 143 at 72)  One of the apartment's bedrooms was being used as an office and, in that bedroom, Bolinsky identified an HP desktop computer as his own.  (*Id.*).

Seney also conducted a passive network search by using a wireless adapter on his field laptop to search for available Wi-Fi networks.  (*Id.* at 78).  The tool identifies the name of each available wireless network, whether it is password-protected, and, if so, what level of encryption is associated with the network.  (*Id.*).  The tool also identifies any electronic devices connected to a Wi-Fi network, providing a way for investigators to account for each device as they search the premises. (*Id.* at 79).  Bolinsky indicated the apartment's Wi-Fi network was named "lynksys-diane" and was password-protected.[4]  (*Id.* at 78).

The investigators seized a total of 15 devices, including Bolinsky's desktop computer.  (*Id.* at 81).  Seney utilized a program called Forensic Toolkit, or FTK, to conduct a forensic examination of Bolinsky's HP desktop.  (*Id.* at 85).  Before examining the computer, Seney installed a device known a hardware write blocker to transfer a forensic image of the three hard drives to the device he would use for the forensic examination.  (*Id.* at 86).  The write blocker permitted the transfer of data from Bolinsky's hard drives to Seney's device and prohibited Seney's device from writing data onto Bolinsky's hard drives.  (*Id.* at 86-87).

Bolinsky's desktop was the only device found to contain evidence of files containing child pornography.  (*Id.* at 81-82).  The HP desktop contained three hard drives – a 160 gigabyte Intel drive, a 1 terabyte Western Digital drive, and a 250 gigabyte Western Digital drive.  (*Id.* at 73-75). Seney identified artifacts of child pornography on each of these three hard drives in a user account titled "Bruce."  (*Id.* at 82).  The password for the "Bruce" account matched a password Bolinsky

---

[4]  Bolinsky's HP desktop computer also was password-protected.  (Doc. No. 143 at 80).

provided to investigators during the search of the Devonshire apartment. (*Id.*). That user account also was connected to an email address Bolinsky provided to investigators. (*Id.* at 84).

Seney also found that "[t]he drives had multiple operating systems installed over time," and there were artifacts of child pornography found on more than one of the operating systems. (*Id.* at 83). Additionally, the HP desktop computer contained artifacts of three peer-to-peer file sharing software programs – Shareaza, eMule, and Tribler – each of which Bolinsky had told investigators that he previously had used. (*Id.* at 84). Seney located "the application installation file[s and] . . . folders that contain[ed] reference to activities of those software packages when they were installed." (*Id.* at 95).

Seney's forensic examination of Bolinsky's hard drives identified "38 total still images of child pornography . . . , two containing bondage, three containing infant and toddler, and nine containing digital documented acts of rape by either vaginal, anal[,] or oral penetration," as well as "15 child pornographic videos, eight containing digitally documented acts of rape or a minor victim vaginally, anally[,] or orally." (*Id.* at 90-91). Seney also uncovered evidence Bolinsky downloaded and then deleted other child pornography files and file-sharing programs, as well as that Bolinsky had installed three programs that operated as "digital cleaners" – Ccleaner, PrivaZer, and jv16 PowerTools. (*Id.* at 91-92). Further, he determined Bolinsky's email address also was associated with a program called hide.me, which operates to disguise a user's IP address from outside view. (*Id.* at 115-16). And Seney identified certain commonly used child pornography search keywords used within the file-sharing programs. (*Id.* at 90, 97-107).

Seney identified thumbnail images in the home folder of a user account titled "bruceb" on the 250 gigabyte Western Digital hard drive that were identified as child pornographic material. (*Id.* at 108-09). He testified that a thumbnail image is only generated after the user account accessed a folder that contained the full-sized image file. (*Id.* at 108). Seney stated that "the full size viewing of

9

that file and data had to be present on the hard disk for that to be injected into the thumbnail version." (*Id.* at 111).  He also found data identified as child pornographic material on the other two hard drives as well.  (*Id.* at 118, 120-22).

Another part of the investigation involved determining whether the hard drives had been compromised by running antivirus software on the image copies of the three hard drives to identify any malware that may be present.  (*Id.* at 128).  Seney did not identify any malware on the 160 gigabyte Intel hard drive.  (*Id.* at 129).  On the 1 terabyte Western Digital hard drive, Seney located "a Hacktool threat," – a forensic tool called "IEPassview" that "assist in recovery of passwords that have been saved in Internet Explorer."  (*Id.* at 129-30).  Seney testified that a person who worked in IT may have and use this tool, and he did not find any evidence that tool might have implanted child pornography artifacts onto the hard drive.  (*Id.*).  He also identified a program called "Unix/Lotoor," which is "able to elevate the permissions or privileges on an Android mobile device."  (*Id.* at 130).  And he found a file identified as "Trojan:Win32/Dynamer!ac" which was capable of collecting data and sending it to a remote attacker but was not capable of downloading file-sharing programs or searching for, downloading, and viewing child pornography.  (*Id.* at 131).

Seney identified the Dynamer!ac virus on the 250 gigabyte Western Digital drive, as well as another file titled "Win32/Dunik!rts," which can allow a remote user to access a computer's camera system and use it for surveillance.[5]  (*Id.* at 131-33).  Seney again found no evidence that either file could place child pornography artifacts on the hard drive.  (*Id.* at 133).

Bolinsky's hard drives contained other evidence that the child pornography files on those drives had been viewed.  Seney described four computer artifacts (prefetch files, recent document lists, Jump Lists, and LNK files) which are generated by an operating system to allow a user quicker

---

[5]  Seney also identified a file titled "Win.Trojan.Ramnit-6181" as a potential threat, but he determined through research that this file was instead benign.  (Doc. No. 143 at 133).

access to previously used programs and files.  (*Id.* at 135-46).  Seney noted that prefetch and LNK files can show that a user accessed specific files through certain applications and also include date and timestamps for the last date and time an application was accessed.  (*Id.* at 136, 142).

Moreover, these files "remain even after the data that they were linked to [has been] deleted[;] they are what we refer to [as] bread crumb artifacts that remain that give us indications of what data was named that used to reside there."  (*Id.* at 144-45).  The data on Bolinsky's hard drives showed "a historical accessing of files over time . . . [and] not an isolated, one-time access of files named consistent with child pornography . . . ."  (*Id.* at 144).

Seney first described the LNK files and other artifacts he found on Bolinsky's computer dating back to July 28, 2015, and continuing through October 9, 2015.  (*Id.* at 146-160).  Seney identified by date and time when the user account accessed numerous files whose titles included common child pornography search terms.  (*Id.*).  Commingled with that data were artifacts showing the user account accessed several websites Bolinsky commonly used in connection with his job and also showing the user account logging into Bolinsky's email account.  (*Id.*).

The hard drives revealed similar evidence from the ensuing months.  On December 7, 2015, the user account accessed a video file with a title containing numerous common child pornography terms.  (*Id.* at 160).  Twenty-four minutes after that file was opened, the user account navigated to the "healthcare.gov" website and then quickly logged into Bolinsky's email account.  (*Id.* at 160-61). The user account searched the email mailbox for the terms "healthcare" and "username" before downloading a file titled "MarketplaceOpenEnrollmentNotice.pdf" a minute later.  (*Id.* at 161).

An hour later, the user account accessed a document titled "WM_f1099_2014.pdf" in a subfolder titled "Tax" within the "Documents" folder.  (*Id.* at 162).  Less than half an hour after that, the user account accessed files with titles containing common child pornography search terms for a period of 33 minutes.  (*Id.*).  The user account then navigated to healthcare.gov to check for an

"Individual Application Eligibility Determination" before accessing multiple files with titles containing child pornography search terms from a folder named "TriblerDownloads." (*Id.* at 162-63). Seney testified he found evidence of a similar pattern of activity on April 14, 2016, April 18, 2016, and June 3, 2016. (*Id.* at 163-67).

On June 30, 2016, the user account conducted a web search for the VPN service "hide.me." (*Id.* at 167-68). The user chose the username "1972mgb@nwohio.us," which was consistent with the password required to unlock Bolinsky's HP desktop computer. (*Id.* at 80, 168). The user account then accessed Bolinsky's email account and viewed an email titled "Tolt Solutions has Work for You" before returning to the hide.me, entering the words "Bruce" and "Bolinsky" in the first and last name fields, and downloading the freeware version of the hide.me setup file. (*Id.* at 169-70). The user account later purchased the hide.me program and then conducted a web search with the search terms "shareaza" and "hide.me." (*Id.* at 172).

Seney also found evidence of the user account accessing child pornography files along with Bolinsky's email inbox and websites he commonly used for work on July 3, 5, 6, 10, 22, and 31, 2016. (*Id.* at 173-78). In August 2016, the user account continued the same pattern while also installing and repeatedly using two registry cleaning programs, jv16 PowerTools and PrivaZer. (*Id.* at 180-86, 225-28). In total, this pattern of accessing child pornography files, followed by legal online activity, followed again by accessing child pornography stretched across at least a 9-month period. (*Id.* at 160 and 186; Doc. No. 145 at 38-41).

Vanderhoff testified next. She denied ever using peer-to-peer file sharing programs on her computer or the HP desktop and denied ever interacting with child pornography. (Doc. No. 145 at 53-54, 60). She also stated she and Bolinsky did not overnight guests at the apartment between November 26, 2015, and August 26, 2015. (*Id.* at 54-55). Vanderhoff testified she used the HP desktop computer at times and that Bolinsky did not exhibit "any secretive behavior" around her

12

regarding that computer.  (*Id.* at 66).  According to Vanderhoff, Bolinsky primarily used a laptop computer he kept in the living room area and less commonly used the HP desktop, which she stated would "pop on randomly" when no one was using it.  (*Id.* at 72-73).

Agent Snyder also testified about the investigation.  Snyder, Seney, and Papenfuss were at the apartment for an hour to an hour and a half on August 26, 2016, collecting the electronic devices and talking with Vanderhoff and Bolinsky.  (*Id.* at 103-04).  Snyder indicated that he commonly asks whether an individual is aware of any viruses on an electronic device or was having any issues with the device.  (*Id.* at 103, 120-22).  Bolinsky did not tell investigators the computer previously belonged to someone else, that the computer "did unusual things," that he had concerns about any viruses on the computer, or that he had concerns someone might be accessing his computer remotely.  (*Id.* at 103).  Snyder then testified regarding the six images and one video file which made up the representative sample shown to the jury of the visual depictions of child pornography found on Bolinsky's hard drives.  (*Id.* at 112-16).

After Snyder completed his testimony, the defense moved for entry of a judgment of acquittal.  (*Id.* at 123-24).  I denied the motion.  (*Id.* at 124).

The defense called Janet Neill, Bolinsky's sister, as its only witness.  (*Id.* at 126-27).  Neill testified that the HP desktop computer initially belonged to her mother, who suffered from Alzheimer's disease.  (*Id.* at 129).  Bolinsky lived at his mother's house at the time to help take care of her; Bolinsky and Neill's brother, Doug Bolinsky, also lived at the house.  (*Id.*)  Bolinsky's mother moved into a nursing home in August 2013.  (*Id.*).  Bolinsky then moved in with Vanderhoff, while Doug stayed at the house, primarily living in the basement.  (*Id.* at 129-30).  Doug continued living in the residence until March 2015, when the house was sold to pay for Bolinsky's mother's nursing home care.  (*Id.* at 130, 133).

13

Vanderhoff earlier testified Bolinsky returned to the house approximately once a week to check on his brother. (*Id.* at 79-80). After moving out in August 2013, Bolinsky left his printer at his mother's house until December 2014. (*Id.*). Vanderhoff stated Bolinsky brought the HP desktop to Vanderhoff's apartment on March 27, 2015, when the house was sold. (*Id.* at 62, 83). Vanderhoff recalled that was the only thing he brought back at that time, besides perhaps some clothes. (*Id.* at 83). Both the printer and the HP desktop computer were kept in the basement, which was the primary area Doug Bolinsky used. (*See id.* at 130).

The case was submitted to the jury following the reading of the final jury instructions and closing arguments. The jury found Bolinsky guilty on the sole count charged in the indictment. (Doc. No. 103).

I held a sentencing hearing on March 2, 2022. Prior to the sentencing hearing, an officer with United States Probation and Pretrial Services prepared a presentence investigation report. (Doc. No. 108) (filed under seal). Grill submitted objections to the calculation of Bolinsky's criminal history category and to enhancements for possession of visual depictions of prepubescent minors, for the use of a computer in committing the offense, and for the possession of more than 600 images. I heard arguments from counsel regarding these objections during the hearing. (*See* Doc. No. 128). I sustained the defense objection to the criminal history calculation and reduced Bolinsky's criminal history category from Category III to Category II. (*Id.* at 16). I denied the defense objection to the application of the three enhancements. (*Id.* at 18-20).

I noted Bolinsky's advisory guideline range was appropriately calculated as 235 to 293 months and was lowered to 235 to 240 months because of the 20-year statutory maximum. (*Id.* at 21-22). I also noted there was a statutory minimum sentence of 60 months. (*Id.* at 23). After hearing additional arguments from counsel, I varied downward from the advisory guidelines and sentenced Bolinsky to a term of 120 months in prison. (*Id.* at 45). I also ordered that Bolinsky serve

a 10-year term of supervised release and pay $3,000 in restitution as well as a $5,000 assessment pursuant to the Justice for Victims of Trafficking Act of 2015.  (Doc. No. 121).

Bolinsky appealed and, through newly appointed counsel, challenged the procedural and substantive reasonableness of his sentence and also argued trial counsel was ineffective at sentencing.  (*See* Doc. No. 136 at 2).  The United States Court of Appeals for the Sixth Circuit rejected Bolinsky's procedural and substantive reasonableness arguments and declined to consider his ineffective assistance argument on direct appeal.  (*Id.* at 3-5).  Bolinsky then filed his motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255.  (Doc. No. 138).

## III.  ANALYSIS

Section 2255 permits a defendant to challenge the sentence he received through a claim that the defendant's sentence was "imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255(a).  Defendants challenging their sentence under § 2255 must identify a constitutional error, "a fundamental defect which inherently results in a complete miscarriage of justice, . . . an omission inconsistent with the rudimentary demands of fair procedure[, or] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent."  *Hill v. United States*, 368 U.S. 424, 428 (1962) (citations and internal quotation marks omitted).

Bolinsky contends he received ineffective assistance of counsel at trial.  An ineffective assistance of counsel claim requires proof the defendant's attorney provided deficient representation and that the attorney's deficient performance caused the defendant to suffer prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Counsel's performance may be found to be deficient if it is "objectively unreasonable under prevailing professional norms."  *Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013) (citing *Strickland*, 466 U.S. at 688).

In order to establish prejudice, a defendant must show "there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Hodges*, 727 F.3d at 534 (citing *Strickland*, 466 U.S. at 694). If a court "can more easily dispose of an ineffective-assistance-of-counsel claim for lack of prejudice, [it] need not consider counsel's alleged deficiencies in performance." *Winborn v. United States*, 602 F. App'x 298, 301 (6th Cir. 2015) (citing *Ross v. United States,* 339 F.3d 483, 492 (6th Cir. 2003)).

Bolinsky asserts nine, at-times overlapping, grounds for relief:

**Ground One**: Mr[.] Bruce Bolinsky was deprived of the effective assistance of counsel when Ms[.] Donna Grill failed to call Mr[.] Bolinsky as the first defense witness. Thus[,] Mr[.] Bolinsky was deprived of his fundamental due process right to present his case and the basic right to be heard in his defense at a fair trial.

**Ground Two**: Mr[.] Bolinsky was deprived of effective assistance of counsel during the trial preparation stage of his criminal proceeding. His attorney, Ms[.] Grill, failed to investigate critical issues in the case. Counsel's failures rendered Mr[.] Bolinsky's trial fundamentally unreliable, because counsel's conduct deprived Mr[.] Bolinsky of his due process right to present critical defense evidence at trial.

**Ground Three**: Mr[.] Bruce Bolinsky was deprived of the effective assistance of counsel when Ms[.] Donna Grill failed to recognize the insufficiency of the evidence shown at his jury trial, and the failure to object to that evidence to preserve it for direct appeal. His counsel's conduct deprived Mr[.] Bolinsky of his due process right to contest that evidence at trial and on direct appeal.

**Ground Four**: Mr[.] Bolinsky was denied effective assistance of counsel during his trial when his attorney, Ms[.] Grill, failed to recognize the insufficiency of the evidence used at his trial. This unduly prejudiced Mr[.] Bolinsky and the jury by allowing evidence to be shown, and not challenged by objection, that failed to meet the interstate commerce element of Mr[.] Bolinsky's charge, 18 U[.]S[.]C[. §] 2252([a])(2). The statue and the jury instructions clearly stated that there had to be transmission or reception by a means of interstate commerce, defined in those jury instructions as the "internet or telephone." Mr[.] Bolinsky also states that he was subsequently denied his constitutional right to a fair trial since evidence was allowed to be shown that did not support the charge. Ms[.] Grill should have objected to that evidence to preserve it for direct appeal. She failed to do so, which is ineffective assistance of counsel.

**Ground Five:** Mr[.] Bolinsky was deprived of the effective assistance of counsel when his attorney, Ms[.] Donna Grill, failed to prepare an adequate defense for him based on the facts of the case told to her over one year before the trial. Ms[.] Grill also failed to recognize the insufficiency of the evidence shown at his trial, and the

failure to object to that evidence to preserve it for direct appeal, depriving Mr[.] Bolinsky of his due process right to a substantive direct appeal.  Rather than work on an effective trial strategy, Ms[.] Grill was instead focused on the easy way out, by attempting to get a guilty plea from Mr[.] Bolinsky for a crime he did not commit. Mr[.] Bolinsky does not know if his counsel did not understand the nature of the trial, or was just indifferent to his plight.  Mr[.] Bolinsky denied any involvement with child pornography, and is actually innocent.  Mr[.] Bolinsky adopts, by reference, ground one, ground two, ground three, and ground four here in ground five.  He further explains the evidence of the users of the HP Pavilion PC, and the unproven theory that Mr[.] Bolinsky was the one who installed the software, was not sufficient to convict him of the charge 18 U[.]S[.]C[. §] 2252(a)(2).  Mr[.] Bolinsky also introduces new evidence in his case.  Mr[.] Bolinsky is actually innocent of the charge.

**Ground Six:**  Mr[.] Bolinsky was deprived of his constitutional right to a fair trial when his appointed counsel, Ms[.] Donna Grill, failed to inform him of his right to waive a jury trial in favor of a bench trial.  Mr[.] Bolinsky was also deprived of his constitutional right to a fair trial when all established court practices and procedures were effectively disregarded in the name of public health, violating Mr[.] Bolinsky's right to face his accuser.  These are also examples of Ms[.] Grill's failure to render effective assistance of counsel.

**Ground Seven**:  Mr[.] Bolinsky was denied effective assistance of counsel when his attorney, Ms[.] Grill, relied almost entirely on the evidence produced by the government, and failed to fully investigate that evidence.  Also, new evidence showing the possibility of access to the HP Pavilion pc though a virus, which was readily available and found with a minimum of searching was not shown at trial. This evidence would have shown doubt in the veracity of the government's case against Mr[.] Bolinsky, and unduly prejudiced the jury into a guilty verdict.  In addition, Mr[.] Bolinsky believes the government withheld critical evidence in his case, some of which could have been exculpatory.  Mr[.] Bolinsky also believes the government presented false evidence by showing pictures not present on the pc.  In [b]oth cases, Mr[.] Bolinsky was deprived of his constitutional right to a fair trial and honest representation.

**Ground Eight**: Mr[.] Bolinsky believes his sentencing was not conducted with the benefit of effective assistance of counsel.  This has prejudiced Mr[.] Bolinsky by subjecting him to an unreasonable sentence based on multiple issues as stated below. Mr[.] Bolinsky has multiple issues with his sentencing and the Pre Sentence Investigation Report (PSI) that led up to it.  Mr[.] Bolinsky's PSI was incorrect and had numerous errors.  Ms[.] Grill never reviewed this report with Mr[.] Bolinsky, instead telling Mr[.] Bolinsky to look it over and get back to her.  Mr[.] Bolinsky was also sentenced using evidence from before the established time and date of the offense.  And last, Mr[.] Bolinsky's attorney, Ms[.] Grill, shoud have asked for a downward variance in his category score based on the United States Sentencing Guidelines section 4A 1.3(b).

> **Ground Nine**: Mr[.] Bolinsky was deprived of effective assistance of trial counsel during all phases of his case.  Mr[.] Bolinsky has found out that he has no right to counsel during collateral proceedings, such as his [§] 2255 motion.  This leaves Mr[.] Bolinsky in the unthinkable position of defending himself with little or no legal knowledge.

(Doc. No. 138 at 21-48).

## A.     GROUND ONE

In Ground One, Bolinsky contends Grill provided ineffective assistance when she advised him not to testify in his own defense, while Bolinsky "adamantly fought to testify as the first defense witness." (Doc. No. 138 at 21).  Bolinsky contends that, because he did not testify, "the testimony of the government's witnesses [went] . . . unrebutted." (*Id.*).

"The right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant." *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000) (citing *Rock v. Arkansas*, 483 U.S. 44, 52, 53 n. 10 (1987)) (additional citations in *Webber* omitted).  A district court must take "steps" to "ensure that a defendant has knowingly and voluntarily waived" this right.  *Carson v. United States*, 88 F.4th 633, 645-46 (6th Cir. 2023).  But courts "presume that defense lawyers have discussed the pros and cons of testifying with their clients," and thus "also presume that defendants have knowingly declined to testify whenever they raise no objection to counsel's decision not to put them on the stand." *Id.* at 646 (internal citations omitted).  As a result, defendants "must place a desire to testify on the record to show that they have not knowingly waived this right through their conduct (their failure to testify)." *Id.* (citations omitted).  A district court need not conduct an "on-the-record colloquy" regarding a defendant's decision not to testify "unless a defendant objects." *Id.*

Bolinsky "cannot now say, after being found guilty . . . that he wanted to testify" given the absence of any evidence he wished to do so at the time. *United States v. Viola*, Case No. 1:08-cr-506,

2011 WL 6749643, at *11 (N.D. Ohio Dec. 22, 2011) (finding the petitioner's waiver of his right to testify was knowing and voluntary where he "wanted to take the stand" but chose not to because he "trusted [his attorneys'] judgment").  There is no contemporaneous evidence that Bolinsky wished to testify at his trial.

Moreover, Bolinsky repeatedly demonstrated a willingness to disagree with his attorneys' advice, as he fired a total of four lawyers before Grill was appointed.  During my August 22, 2019 *ex parte* conference with Bolinsky and Crossmock, Bolinsky accused Crossmock and Groth of ignoring his requests for Seney's FTK report, failing to address his concerns, failing to thoroughly investigate his theory that a remote hacker used the viruses on the hard drives to download and share child pornography from his HP desktop computer, and misleading him regarding their knowledge of computer technology and experience with child pornography cases.  (Doc. No. 53 at 10-13, 23-25, and 34-37).  Bolinsky's failure to contemporaneously voice a desire to testify in his own defense speaks even louder in light of his prior conduct.

Bolinsky fails to show he received ineffective assistance of counsel when Grill advised him not to take the stand at trial.  Therefore, I deny his motion as to Ground One.

## B.    GROUND TWO

In support of his ineffective assistance claim in Ground Two, Bolinsky contends Grill provided ineffective assistance:

> when she failed to retrieve the available evidence contained in the public record, the possession of the government, the possession of the defendant, Bruce Bolinsky, and his fiancee, Diana Vanderhoff, and previous discovery and evidence from previous attorneys[.]  This additional evidence would have had a profound impact on Mr Bolinsky's trial.  Ms Grill failed to review many pieces of evidence to ascertain their veracity.  Moreover, Ms Grill advised Mr Bolinsky that the government would provide Ms Grill with their investigative findings , which did not include the listed items.  Thus, Ms Grill violated Mr Bolinsky's trust[], depriving him of his attorney's honest service.

(Doc. No. 138 at 27).  As with many of his other grounds for relief, Bolinsky includes a laundry list of grievances within this ground.

### 1.    Subparagraphs One and Two

In subparagraph one, Bolinsky claims Grill failed to obtain a report from Snyder providing in discovery to Phillips, Bolinsky's first attorney, stating Bolinsky denied any connection to child pornography files when Snyder, Seney, and Papenfuss executed the search warrant on August 26, 2016.  (*Id.*).  In subparagraph two, Bolinsky asserts Grill failed to follow up on this matter after Bolinsky's Freedom of Information Act request for Snyder's notes from that interview was denied.  (*Id.*).  In his reply brief in support of his § 2255 motion, Bolinsky asserts Snyder "perjured himself under oath" by testifying that Bolinsky admitted downloading child pornography.  (Doc. No. 148 at 1).

The basic problem with these arguments is that they have no basis in fact.  The government provided Snyder's report to Grill on January 31, 2020.  (*See* Doc. No. 147-1 at 1).  And no witness, including Snyder, ever testified that Bolinsky admitted downloading child pornography.  (*See* Doc. No. 145 at 91-122).  As Bolinsky cannot show Grill's performance was deficient because the circumstances underlying his claim did not actually occur, I conclude he cannot demonstrate he received ineffective assistance of counsel as to these matters.  *See, e.g., United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (defendant bears the burden to prove his attorney's performance fell below an objective standard of reasonableness) (citations and internal quotation marks omitted).

### 2.    Subparagraphs Three and Seven

In subparagraph three, Bolinsky argues Grill failed to challenge the chain of custody of the HP desktop, which Bolinsky alleges was deficient because the HP desktop was not specifically listed on the certified inventory.  (Doc. No. 138 at 28).  He offers similar arguments in subparagraph seven.  (*Id.* at 29-30).

It is true that the certified inventory lists an "HP laptop" instead of an HP desktop.  (Doc. No. 138-7).  But Seney clarified during his testimony that the HP desktop computer was one of the fifteen devices seized from the apartment on August 26, 2016.  (*See, e.g.,* Doc. No. 144 at 26).  And there is no evidence Bolinsky or Vanderhoff owned an HP laptop in August 2016.  Every witness who testified at trial identified the HP desktop as Bolinsky's.

Bolinsky does not deny that the HP desktop was his computer, or that the evidence shows the HP desktop hard drives were the only drives to contain child pornography artifacts.  Instead, he offers vague allegations that "proper crime scene evidence collection techniques [were not] followed . . . [and that anyone] or anything could have altered the evidence at any time."  (Doc. No. 138 at 28).

Generally, "challenges to the chain of custody go to the weight of evidence, not its admissibility."  *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990) (citing cases).  Any defect in the chain of custody of the HP desktop would pale in the face of the nine-month pattern of child pornography activity intermixed with legal online activity involving Bolinsky's personal and professional lives.  Moreover, Bolinsky only speculates that the evidence was altered – speculation that could not be substantiated by the experts consulted by Grill, Crossmark, and Groth – and speculative arguments are "insufficient to support an ineffective-assistance claim."  *Fautenberry v. Mitchell*, 515 F.3d 614, 634 (6th Cir. 2008).  Bolinsky's Sixth Amendment claim fails on this basis as well.

### 3.      Subparagraph Four

In subparagraph four, Bolinsky asserts Grill did not sufficiently investigate his claim that someone else remotely accessed his computer to download and share the child pornography files.  (Doc. No. 138 at 28).  Bolinsky points to evidence of three programs designed to permit remote access to a computer.  (*Id.*).

Bolinsky's arguments again ignore what actually occurred in this case. Bolinsky previously insisted that Groth and Crossmock pursue this line of inquiry. The expert they retained could not find evidence on any of the three hard drives to validate Bolinsky's beliefs about remote access. (*See* Doc. No. 53). Seney found several viruses on two of the hard drives that could permit remote access, but he found no evidence that any child pornography files or artifacts were placed on Bolinsky's computer remotely. (Doc. No. 143 at 128-33). And Adam Kelly, a forensic expert retained by Grill to assist with trial and trial preparation, had access to all the digital forensics in the case and similarly found no evidence of remote placement of child pornography artifacts. (*See* Doc. No. 144 at 14; Doc. No. 145 at 3-4). Bolinsky fails to show Grill's investigation of his theory fell beneath an objective standard of reasonableness. *Pierce*, 62 F.3d at 833. Therefore, I deny his ineffective assistance claim on this basis.

### 4.     Subparagraph Five

In subparagraph five, Bolinsky argues Grill should challenged the admissibility of evidence of child pornography activity prior to the time frame specified in the indictment. (Doc. No. 138 at 29). Bolinsky claims he was unfairly prejudiced because the jury heard evidence involving child pornography files prior to the time he moved the HP desktop from his mother's house to Vanderhoff's apartment[6,7] (*Id.*). He also claims Grill should have challenged any evidence without a specific date and time stamp. (*Id.*).

---

[6]  In early 2015, investigators made incomplete downloads of four files from an IP address assigned to Bolinsky's mother's residence. At least one of these files contained suspected child pornography. Snyder subsequently drove by the house and learned it had been sold. (Doc. No. 145 at 23-28). Seney identified two artifacts from those files on the HP desktop. (*Id.* at 25-26).

[7]  Bolinsky also asserts "Grill should have objected to this evidence being shown during the trial." (Doc. No. 138 at 29). But the jury did not view any child pornography files from the incomplete downloads during the trial. Therefore, Grill could not have provided ineffective assistance in connection with this evidence.

Bolinsky's first argument in this subparagraph is difficult to understand.  The government did not introduce the evidence of the undercover download from Bolinsky's mother house in early 2015.  In fact, the government "put on the record that the Government has no plans to elicit that information.  We have instructed our witnesses not to [elicit] that information." (Doc. No. 143 at 125).  It was the defense that brought in this information.  Indeed, it was central to the defense argument that the government could not prove it was not Bolinsky's brother Doug, who resided at their mother's home (where the HP desktop was kept) for over a year and a half after Bolinsky moved out, that actually was responsible for the child pornography files on the HP desktop.  (*See, e.g.,* Doc. No. 146 at 48-50).  Bolinsky fails to explain how Grill provided ineffective assistance by introducing evidence that could potentially connect another person to those files before it came into Bolinsky's possession.

His second argument in subparagraph five fares no better.

As I noted above, Seney testified that a thumbnail image is only generated after the user account accessed a folder that contained the full-sized image file, and that "the full size viewing of that file and data had to be present on the hard disk for that to be injected into the thumbnail version." (Doc. No. 143 at 108 and 111).  He also noted that prefetch and LNK files can show that a user accessed specific files through certain applications and also include date and timestamps for the last date and time an application was accessed.  (*Id.* at 136, 142).  Moreover, these files "remain even after the data that they were linked to [has been] deleted[;] they are what we refer to [as] bread crumb artifacts that remain that give us indications of what data was named that used to reside there."  (*Id.* at 144-45).  The data on Bolinsky's hard drives showed "a historical accessing of files over time . . . [and] not an isolated, one-time access of files named consistent with child pornography . . . ."  (*Id.* at 144).

The representative sample shown at trial contained six images and one video.  The first file was a thumbcache file created by Windows and found in unallocated space on the 160GB Intel hard drive.  Seney testified that "Windows doesn't store the date and time that specific thumbnail was created.  But what we do have is the date and time that the database here that contained the image was both created and the last time it was modified."  (Doc. No. 143 at 118).  Based upon this information, Seney was able to determine the sampled image was created between August 2, 2016, when the database was created, and August 24, 2016, when the database was last modified.  (*Id*.).  The second and third files each contained a separate still image obtained through the single source download between November 26 and 27, 2015.  (*Id*. at 119-20).  Seney did not locate either of these files on the three hard drives.  (*Id*.).

The fourth file contained a still thumbnail image found in the bruceb user account on the Western Digital 250GB hard drive.  (*Id*. at 120).  The thumbnail file was created by the Linux operating system and included Linux-created time stamp of May 10, 2016, 6:07:28 p.m. Greenwich Mean Time.  (*Id*. at 120-21).  Seney located the fifth and sixth files in the bruceb user account on the Western Digital 250GB hard drive as well.  Both files also contained specific date and time stamps. (*Id*. at 121-22).

The seventh file contained excerpts from a video file located in unallocated space on the one terabyte Western Digital hard drive.  (*Id*. at 122).  Seney testified the file "previously had resided [on the hard drive] as a file that could be accessed, and had then been deleted and then pushed into that data purgatory of unallocated space where we're able to use techniques to bring back enough of that file to actually play and view its contents."  (*Id*.).

While Bolinsky claims Grill should have challenged this evidence at an evidentiary hearing prior to trial, he fails to show her decision not to do so was unreasonable.  First, there was sufficient evidence connecting the files in the representative sample to Bolinsky's computer and residence such

that an evidentiary challenge would have been unsuccessful. Second, in order to challenge the evidence, Grill would have been required to reveal at least some of her trial strategy in arguing against the admission of the evidence. Grill did not provide ineffective assistance when she chose not to pursue an argument on which she was not likely to succeed. *See, e.g., Moore v. Mitchell*, 708 F.3d 760, 796 (6th Cir. 2013).

Grill instead challenged this evidence on cross-examination, getting Seney to admit he could not say for certain when the thumbcache file was created or whether the original file was downloaded or accessed on the computer from an external storage device. (Doc. No. 144 at 29-30). Seney acknowledged he could not say for certain whether the second and third files were downloaded from the HP desktop computer and that the fourth, fifth, and sixth files also could have been created when someone accessed files on an external storage device. (*Id.* at 31-33). And Seney conceded he could not tell when or how the seventh file was created, and that that file could only be accessed with the use of specialized forensic tools. (*Id.* at 33-34).

Bolinsky has not shown Grill's decision to challenge the evidence contained in the representative sample on cross-examination rather than in a pretrial evidentiary hearing did not fall "within the wide range of reasonable professional assistance." *Strickland*, 446 U.S. at 689. Therefore, I reject his second argument as well.

### 5. Subparagraph Six

In this subparagraph, Bolinsky alleges Grill called him approximately eight weeks before his October trial, told him "she did not have a defense for [him]," and that he should plead guilty.[8]

---

[8] Bolinsky claims he "was in disbelief" at these comments. (Doc. No. 138 at 29). This assertion is dubious, as at least two of Bolinsky's prior attorneys advised him to plead guilty, and he in fact did so before Grill was appointed and filed a motion to withdraw his plea. But the truth or falsity of his claim is not material to the resolution of this ground for relief, and so I need not consider it.

(Doc. No. 138 at 29). Bolinsky claims he told Grill "he did have a defense, but she did not listen to him," and that Grill did not use sufficient time to prepare for trial. (*Id.*).

As the government notes, (Doc. No. 147 at 9), Grill maintains a policy of refusing to discuss her representation of a defendant in any case. Thus, Grill's recollection of this conversation is not a part of the record. But even if I assume Grill said what Bolinsky alleges, he fails to show she provided ineffective assistance.

First, it is defense counsel's professional responsibility to give their clients an honest opinion on the strength of the government's case and the likelihood of success at trial. The apparent fact that Grill believed Bolinsky would be better served by pleading guilty than going to trial is not an unreasonable view to hold.

Similarly, it was not unreasonable for Grill to express skepticism of Bolinsky's proposed defense – that an unknown third party remotely accessed his computer and downloaded and shared child pornography files. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

While Grill's precise perspective is unknown, it is not difficult to evaluate her conduct from the circumstances that existed at the time. Grill knew the government had evidence of a consistent pattern – stretching for months, if not years – of access of child pornography files on the HP desktop contemporaneously with Bolinsky's legal online activity. She knew the government could prove Seney obtained two child pornography files through a single source download from an electronic device connected to the IP address assigned to Vanderhoff's apartment, where the Wi-Fi network was password-protected. And she knew, while Bolinsky denied any child pornography

activity, he had admitted to investigators that he was familiar with and had used the three peer to peer file-sharing programs involved in this case.

In the face of this evidence, Bolinsky sought to pursue a claim, in essence, that: a bad actor remotely accessed only the HP desktop out of the large number of electronic devices Bolinsky kept at the apartment; downloaded and installed file-sharing software, and then deleted and reinstalled that software multiple times; downloaded, shared, viewed, and deleted child pornography files; frequently viewed those child pornography files very close in time to when Bolinsky was conducting legal online activity (though never at the exact same time); and downloaded and utilized specialized file-cleaning programs.  On top of that, Bolinsky's proposed defense was merely theoretical – there was no evidence that any of the viruses found on his computer had the capability of being used in the way Bolinsky claimed they could be.

Moreover, Bolinsky cannot show he suffered any prejudice from this incident.  *See Winborn*, 602 F. App'x at 301 (If a court "can more easily dispose of an ineffective-assistance-of-counsel claim for lack of prejudice, [it] need not consider counsel's alleged deficiencies in performance.").  Grill pursued this theory at trial, as she got Seney to confirm he identified a virus on Bolinsky's HP desktop capable of giving "a malicious hacker access and control of [the] PC."  (Doc. No. 145 at 18).  Moreover, I observed Grill's performance throughout the trial, both on and off the record, and did not find any indication that she was not adequately prepared.

Because Bolinsky cannot demonstrate he suffered any prejudice, I deny his ineffective assistance claim in subparagraph six.

## C.  GROUND THREE

In this ground, Bolinsky asserts Grill provided ineffective assistance "when she failed to object to the evidence shown at trial that was clearly insufficient."  (Doc. No. 138 at 31).  This is factually incorrect.  Grill's co-counsel at trial, Christian Grostic, made a Rule 29 motion for entry of

a judgment of acquittal at the close of the government's case, arguing there was insufficient evidence to establish each of the essential elements of the offense.  (Doc. No. 145 at 123-24).  I concluded there was sufficient evidence from which a jury could reach a guilty verdict and denied the motion. (*Id.* at 124).

Bolinsky also asserts "[i]t is beyond any reasonable doubt that had Ms[.] Grill objected to the prejudicial images and video clip presented at trial and shown to the jury, the outcome of the trial likely would have been quite different."  (Doc. No. 138 at 32).  This claim again is factually incorrect. On August 16, 2019, I held a preliminary hearing during which Groth and Crossmock objected to the files in the representative sample pursuant to Federal Rule of Evidence 403, arguing the probative value of those files was substantially outweighed by the danger of unfair prejudice, confusing the issues at trial, and misleading the jury.  (*See* non-document entry dated Aug. 16, 2019). I concluded the evidence did not violate Rule 403 and overruled the defense objection.  (*Id.*).  And I further noted on the record that the defense preserved its objection to my ruling.  (*Id.*).

Having decided the manner once, I would not have reconsidered that decision unless there was new, probative evidence that shifted the weight in the opposite direction.  There was no such evidence, and so Grill did not provide ineffective assistance by choosing not to move for reconsideration of my earlier ruling.  Therefore, I deny Bolinsky's motion as to Ground Three.

## D.    GROUND FOUR

In Ground Four, Bolinsky asserts Grill violated his constitutional right to counsel when she failed to object that there was not sufficient evidence of "receipt and distribution of child pornography by a means of interstate commerce." (Doc. No. 138 at 33).  A "means or facility of interstate commerce" was defined in the jury instructions as including "the internet or the telephone."  (Doc. No. 101 at 17).

This assertion also is factually incorrect.  Grostic argued the government's evidence was insufficient to establish each of the essential elements of the § 2252(a)(2) charge.  And there was evidence of the use of the internet in committing this offense, as Seney testified a computer or similar device and the internet are required to use a peer to peer file sharing program to download child pornography.  (Doc. No. 143 at 45).

I deny Bolinsky's § 2255 motion as to Ground Four.

## E.  GROUND FIVE

Bolinsky's claims in Ground Five are substantially similar to those in Ground Two, subparagraph six.  (*See* Doc. No. 138 at 29, 35-37).  As in Ground Two, subparagraph six, Bolinsky's arguments here primarily rely on a gross mischaracterization of the facts presented at trial.  He repeats many of the same claims I denied above, including that Grill: failed to prepare an adequate defense, to recognize the insufficiency of the evidence, and to object to that evidence; and did not investigate Bolinsky's remote access theory.  (*Id.* at 35-37).  He also asserts Seney testified he did not look for any exculpatory evidence.  (*Id.* at 36-37).  I rejected these arguments as baseless and see no need to retread the same terrain.

Bolinsky also raises several new lines of argument.  He first argues his case is "remarkably similar" to *United States v. Lowe*, 795 F.3d 519 (6th Cir. 2015), in which the Sixth Circuit reversed the defendant's § 2252(a) conviction.  In *Lowe*, the appellate court concluded no rational juror could conclude the defendant knowingly downloaded, possessed, and distributed child pornography files based upon the limited evidence that the defendant owned and occasionally used the laptop containing the child pornography, when two other people lived in the home and had open access to the computer, "without improperly stacking inferences."  *Lowe*, 795 F.3d at 523.  The court noted that while the government offered evidence regarding legal internet activity occurring on the laptop, the government did not connect that activity to a specific resident, including the defendant.

But that case is not this one. The trial evidence squarely connected Bolinsky to the child pornography files – the files were found on user accounts he set up; Bolinsky admitted using Shareaza, eMule, and Tribler, while Vanderhoff did not even know what those programs were; and accessed his email account and work-related websites contemporaneously with child pornography files.

One sequence of events was particularly damning. On December 7, 2015, the Bruce user account accessed a video file with a title containing numerous common child pornography terms before searching Bolinsky's email account for the terms "healthcare" and "username" and downloading an open enrollment application from healthcare.gov. (*Id.* at 160-61). An hour later, the Bruce user account accessed a document stored in a subfolder titled "Tax" before again accessing child pornography files. (*Id.* at 162). The Bruce user account then navigated to healthcare.gov to check for an "Individual Application Eligibility Determination" before accessing multiple files with titles containing child pornography search terms from a folder named "TriblerDownloads." (*Id.* at 162-63). A reasonable juror could easily infer that Bolinsky was the one who took all of those actions.

Bolinsky next argues that Grill failed to raise that fact that Bolinsky enabled the Firefox browser to sync his browsing history and other data among any device connected to his Firefox account. (Doc. No. 138 at 36). Again, this is factually incorrect. Grill pursued this argument during her cross-examination of Seney. (Doc. No. 145 at 22, 42). But, more to the point, synchronization of Bolinsky's browser history cannot explain away Bolinsky's interaction with his healthcare and tax files that were physical located on the HP desktop.

Finally, after pointing the finger at his brother during the trial, Bolinsky pivots to suggest that perhaps a member of his fiancé's family was responsible, because he and Vanderhoff hosted eight members of Vanderhoff's family on Thanksgiving Day, November 26, 2015, when Seney

30

began his single source download. (Doc. No. 138 at 35) ("[N]ot only were Mr Bolinsky and Ms Vanderhoff both users of the pc, and used it on that day, any one of the 8 other people in that room . . . could have used that computer."). But Bolinsky discredits his own argument, stating "[t]he HP Pavilion pc and [its] monitor [were] clearly visible to everyone in the apartment . . . [with] the monitor itself . . . clearly visible from the couch and living room, where everyone was seated." (*Id.*). Vanderhoff also testified a person sitting on the couch could look into the second bedroom and see the HP desktop computer, noting the apartment was only 748 square feet. (Doc. No. 145 at 63).

Additionally, Seney testified that an individual user does not need to be physically present when files are shared through a peer-to-peer platform. (Doc. No. 145 at 28-29). If the files are available for upload and the client software is running and connected to the file-sharing network, the files can be transferred to another client with or without a user physically present. (*Id.*).

Bolinsky's ineffective assistance claims in this ground for relief have no merit, and I deny his motion as to Ground Five.

## F.  GROUND SIX

In this ground, Bolinsky asserts he was deprived of his right to a fair trial because Grill did not inform him that he could waive his right to a jury trial in favor a bench trial, and "when all established court practices and procedures were effectively disregarded in the name of public health, violating Mr[.] Bolinsky's right to face his accuser." (Doc. No. 138 at 38). Both arguments fail.

Bolinsky asserts he was not aware of the possibility of a bench trial "until he found it in a law book after he was incarcerated in a federal prison." (*Id.*). But during his change of plea hearing before Judge Knepp, Bolinsky confirmed he understood that, by pleading guilty, he gave up his right to a trial, whether that trial was "to the Court, meaning to a judge . . . [or] to a jury." (Doc. No. 45 at 16-17). Bolinsky cannot credibly claim he did not know about the potential availability of a bench trial when he previously acknowledged he would give up his right to such a trial by pleading guilty.

Moreover, Bolinsky could not unilaterally elect a bench trial; the government first must consent, and the court must approve the waiver of a jury trial.  Fed. R. Crim. P. 45(a).

Bolinsky next argues Grill should have objected to the installation of "12 extra monitors less than 2 feet from the jury" because he was prejudiced when the jurors viewed the representative sample on these monitors rather than "the large monitor on the wall only."  (Doc. No. 138 at 38).

As an initial matter, Bolinsky's assertion of the facts is again incorrect.  I instructed the Court's IT staff to place two additional exhibit monitors in front of the four jurors seated in the gallery to make it easier for them to see the exhibits and the witness at the same time.  (Doc. No. 144 at 9-10, 18-19).  The other nine jurors (the parties agreed to seat one alternate juror) sat in the regular jury box,[9] which contained permanently installed exhibit monitors of the same size (twenty-seven inches), one monitor for every two juror chairs, as those placed in front of the gallery.

The two large monitors mounted on the wall were 55 inches.  Given the configuration of the courtroom, the only large monitor visible to all the jurors at the same time was located on the far wall of the 45-foot-wide courtroom.  Bolinsky fails to explain how it would have been less prejudicial to display images which included infants and toddlers being raped by adult men on a screen more than four times the area of the exhibit monitors used during the trial.  Grill was not ineffective for failing to object to the placement of the two monitors near the jurors seated in the gallery.

Third, Bolinsky contends the jury was unduly prejudiced because his trial "was an 'experiment' . . . [with] no set procedures in place."  (Doc. No. 138 at 38).  This is untrue.  The only "experiment" involved was the adaptation of the courtroom to protect public health in response to a

---

[9]  As part of the Covid-19-related protocols used during the trial, the jurors selected for the trial elected via confidential ballot to sit in every other chair in the jury box, necessitating that several jurors sit distanced in the side of the courtroom gallery closest to the jury box.  (*See* Doc. No. 143 at 3).

surge in Covid-19 infections.  "[T]rial courts have inherent authority, and even 'grave responsibility,' to determine what safety measures are necessary to protect the judge, court personnel, the parties, the lawyers, the jurors, and the audience in and around the courtroom." *United States v. Smith*, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021) (citation omitted) (upholding defendant's conviction at trial conducted with Covid-19 safety protocols, including the required use of face masks).

Bolinsky's trial was the first trial over which I presided after in-person courthouse proceedings resumed.  All courtroom participants were required to wear masks unless they were testifying or speaking on the record.  (*See* Doc. No. 143 at 3).  Clear Plexiglass panels were placed around the witness stand, on the bench, and on counsel tables to help restrict any viral transmission. All other procedures in the case followed the standard, well-established courtroom protocols.  Given that these protocols applied to everyone in the courtroom, Bolinsky's complaint that wearing a mask made him "look like some sort of train robber or criminal who wore a mask" is unavailing.  (Doc. No. 138 at 39).

Nevertheless, Bolinsky argues he was denied his constitutional right to confront his accusers because he was required to sit behind the Plexiglass shield and to wear a mask at counsel table, so that the jurors could not observe his facial expressions.  (*Id.* at 39-40).

But the right to confront an accuser face-to-face is not literally about faces.  Instead, the Sixth Amendment protects the right of a defendant "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Notably, the Supreme Court has held that there are some circumstances in which "a physical, face-to-face confrontation at trial" is not required.  *Maryland v. Craig*, 497 U.S. 836, 850 (1990) (upholding state law permitting, in limited circumstances, a child witness to testify in a separate room from the defendant through the use of one-way closed circuit television).

33

"'[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination.'"  *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)) (alteration by *Stincer*).  Generally, the Confrontation Clause:

> (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth';[ and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158 (1970) (footnote omitted).

Significantly in this case, each of the witnesses who testified during the government's case-in-chief removed their masks while testifying.  Thus, the jury was able to view these witnesses' facial expressions and other mannerism as they testified, just as in a trial that did not require the use of additional public safety measures.[10]  The Sixth Circuit previously upheld a district court's use of substantially similar protocols, including requiring every courtroom participant to wear a mask unless they were testifying or speaking on the record, concluding those protocols did not violate the defendant's Confrontation Clause rights.  *Smith*, 2021 WL 5567267, at *1-2.  *See also Bogan v. Christiansen*, Case No. 24-cv-10427, 2024 WL 4874217, at *8 (E.D. Mich. Nov. 22, 2024) (holding defendant's right to confrontation was not violated when witnesses were required to wear face masks while testifying to "further[] the important public policy of preventing COVID-19 transmission") (citing *United States v. Maynard*, 90 F.4th 706, 710-11 (4th Cir. 2024)).

I conclude Bolinsky failed to show Grill provided ineffective assistance by not objecting to the use of Covid-19 safety protocols during his trial and deny his motion on this basis.

---

[10]  Neill, Bolinsky's sister and only witness, did not remove her mask while testifying.

34

**G.    GROUND SEVEN**

In Ground Seven, Bolinsky resorts to accusing the government of withholding "critical evidence in his case, some of which could have been exculpatory," presenting "false evidence by showing pictures not present on the pc," and "remov[ing] items from the discovery upon his replacement of his counsel with new counsel."  (Doc. No. 138 at 41).

Bolinsky has no evidence to support his accusations.  He does not explain what he means by "critical evidence," nor has he identified any evidence actually withheld.  Bolinsky repeats his disproven allegations that the government did not turn over Snyder's report and did not look for exculpatory evidence.  (*Id.* at 41-43) (subparagraphs 1, 3, 7, 8, 9, 10, 12, and 13).

Bolinsky attempts to justify his "false evidence" attack by arguing the government did not show the actual thumbnail images Seney found on his computer because a thumbnail "is a low resolution file that should have been much more grainy or blocky in appearance," and so he "believes [the government] showed higher resolution pictures they found somewhere else."  (*Id.* at 42) (subparagraph 6).  Again, Bolinsky offers no evidence to support this accusation.  And Seney testified regarding how he retrieved the still images from the drives' thumbcache and thumbnail storage.  (Doc. No. 143 at 108-12, 117-22).

Bolinsky fails to carry his burden to establish he is entitled to relief regarding these or his remaining arguments.

**1.    Subparagraph 2**

Bolinsky next raises allegations of error in connection with his change of plea hearing.  He alleges that immediately before that hearing, Groth told him "that, if he went to trial and [was] found innocent, the government would try his fiancée, Ms[.] Vanderhoff, for the crime.  This is the very definition of coercion."  (Doc. No. 138 at 41).  Bolinsky continues: "Mr Bolinsky does not know whether the government's prosecutor had told Mr Groth that they would go after Ms

Vanderhoff, or whether Mr Groth thought that up on his own to get a guilty plea and avoid a trial." (*Id.*).

Bolinsky's problem here goes beyond the lack of any evidence to support his claim. There in fact is evidence in the opposite direction. After entering a plea of guilty during the change of plea hearing, Judge Knepp asked Bolinsky two questions: (1) "Did anybody threaten you to cause you to say that to me?"; and (2) "Did anyone promise you anything to get you to say that to me?" (Doc. No. 45 at 30). Bolinsky stated no one threatened him and no one promised him anything. (*Id.*).

While I find Bolinsky's allegations inherently incredible and his attacks on the ethics of both government counsel and Groth without basis,[11] I need not resolve this particular dispute. Bolinsky fired Groth and Crossmock (who represented him during the change of plea proceedings), withdrew his plea after obtaining new counsel, and proceeded to trial. Bolinsky fails to explain how these alleged circumstances undermine the validity of his conviction and sentence.

### 2.    Subparagraph 4

Bolinsky asserts "that during his trial, Mr[.] Seney apparently went back and reinvestigated the computer without notifying the defense counsel. . . . Mr Bolinsky was asking for a mistrial but his attorney, Ms Grill, had talked him out of [it]." (Doc. No. 138 at 42). "Mr Bolinsky did not have

---

[11]  Bolinsky also accuses government counsel of misconduct through calling Vanderhoff to tell her "what she can and cannot say during her testimony . . . concerning Mr Bolinsky's previous residence and his brother." (Doc. No. 148 at 5). As noted on the record at trial, government counsel instructed Vanderhoff not to mention a prior undercover download from Bolinsky's mother's residence because that download occurred outside of the date range in the indictment. (Doc. No. 143 at 125). In other words, government counsel instructed Vanderhoff not to discuss additional evidence that Bolinsky engaged in child pornography activity because that evidence could not be used to convict him of the indicted charge. Bolinsky fails to explain how this attempt to protect his constitutional rights instead violated them.

a clear understanding as to what would have been involved in a mistrial[] and would have taken the mistrial gladly knowing what he now knows."  (*Id.*).

Once again, Bolinsky's arguments cannot survive in the face of the record evidence.  The government mistakenly failed to transmit a revised version of its Exhibit 20, which listed all of the files contained in the representative sample.  (Doc. No. 144 at 5).  The revised version added some additional information to the original version, which was disclosed during discovery.  (*Id.*).  the additional information also was contained in previous discovery disclosures, but the government mistakenly failed to disclose the revised version of what it described as a "demonstrative [exhibit] . . . to assist the jurors in understanding the representative sample."  (*Id.* at 8-9).

Bolinsky consulted with counsel and elected not to request a mistrial due to the error in disclosure of the government's revised Exhibit 20.  (Doc. No. 144 at 13, 15-16).  Bolinsky stated on the record that he was "in agreement with [his] counsel's representation not to move for a mistrial."  (*Id.* at 15-16).

A short time later, during the defense's cross-examination of Agent Seney, Seney testified that he composed a supplemental report after scanning the hard drives a second time with a tool called Magnet Forensics AXIOM to double-check his initial scans.  (*See* Doc. No. 144 at 35-36, 43).  In response to a question from Grill, Seney stated he reviewed a connected devices dataset created by the AXIOM scan.  (*Id.* at 36).  Seney had not previously indicated he viewed this dataset, and the government did not disclose it because it was unaware Seney had done so.  (*Id.* at 37-39).

Defense counsel consulted with Bolinsky and Kelly, the defense's retained expert.  Grill moved for a mistrial for the nondisclosure of the connected devices dataset Seney viewed but did not include in his report.  (*Id.* at 55).  I denied the motion as premature, because the information contained in the dataset was included in the discovery produced and because Kelly was to make a follow-up visit to the Secret Services office to review what Seney had done.  (*Id.* at 62-65).  The

following day, Kelly reviewed the AXIOM scan Seney performed on July 21, 2021, and determined there was no forensic evidence that Seney had in fact run or viewed a connected devices dataset. (Doc. No. 145 at 3-4, 7).  The defense then indicated it was comfortable moving forward with the trial and was not renewing its request for a mistrial.  (*Id.* at 4).

In sum, Bolinsky affirmatively stated on the record that he had consulted with counsel and agreed with the decision not to request a mistrial with regard to the revised Exhibit 20, Grill moved for a mistrial concerning the apparent viewing of the connected devices dataset, and Bolinsky did not voice any concern when Grill stated the defense would not renew its request for a mistrial. Moreover, I denied the request for a mistrial when it appeared Seney <u>had</u> viewed the connected devices dataset.  There was no possibility that a second request for a mistrial would have been successful when the forensic evidence revealed Seney simply misspoke at trial, because he did not actually run the connected devices dataset.  Bolinsky fails to show Grill's decision not to renew the mistrial request was objectively unreasonable or that he suffered any prejudice as a result.

### 3.  Subparagraph 5

Bolinsky next attacks his indictment, alleging he "believes the circumstances behind his indictment by a grand jury were done under false pretenses as evidence was not shown or selectively shown, provided there actually was a grand jury."  (Doc. No. 138 at 42).  Bolinsky again offers no evidence to support his inflammatory accusations.  But more to the point, he also identifies no basis for relief.

"The general rule is that the sufficiency of an indictment cannot be challenged in a Section 2255 motion if, under any reasonable construction of the indictment, a crime is charged and the accused is fairly apprised of the crime intended to be alleged."  *Clinkscale v. United States*, 367 F. Supp. 2d 1150, 1157 (N.D. Ohio 2005) (citing *Walker v. United States*, 439 F.2d 1114, 1115 (6th Cir. 1971);

*Eisner v. United States,* 351 F.2d 55, 57 (6th Cir. 1965); and *U.S. v. Boyd,* 259 F. Supp. 2d 699, 708 (W.D. Tenn. 2003)).

The sole count of the indictment clearly and fairly informed Bolinsky of the crime charged. Therefore, I deny his motion on this basis.

### 4. Subparagraph 11

In subparagraph 11, Bolinsky asserts Grill was ineffective because she did not address an allegedly incorrect portion of his Presentence Investigation Report ("PSR"). (Doc. No. 138 at 43). Bolinsky asserts a Probation and Pretrial Services officer raised the issue during the sentencing hearing and that I concluded the PSR was incorrect. (*Id.*). But the officer Bolinsky identified did not prepare his PSR or appear at the sentencing hearing. And while I sustained several defense objections to the criminal history calculation, Bolinsky does not identify the specific error at issue here.

Whatever the alleged error, Bolinsky fails to show he was prejudiced by any of Grill's alleged acts or omissions and, therefore, he cannot show his right to the effective assistance of counsel was violated. *See Winborn*, 602 F. App'x at 301.

### H. Ground Eight

In Ground Eight, Bolinsky alleges he received ineffective assistance of counsel during the sentencing phase. He asserts: (1) Grill did not review the PSR with him; (2) the PSR contained numerous errors; (3) he was sentenced "using evidence from before the established time and date of the offense"; and (4) Grill should have requested a downward variance in connection with a misdemeanor conviction that was nearly outside of the 10-year lookback period for his criminal history category calculation. (Doc. No. 138 at 41-42). But most of Bolinsky's allegations again are contradicted by the record evidence.

As I noted above, Grill does not provide affidavits or other information about her representation of clients. Thus, the record only contains Bolinsky's allegations that Grill did not review the PSR with him in addition to the historical evidence included on the docket.[12] After the first disclosure of the PSR, Grill asked for and received an extension of time to submit objections to the PSR. (Doc. No. 107). She then submitted four objections to the PSR, including three objections to the assessment of points for certain prior convictions and an objection to the application of three enhancements because those enhancements are applied in nearly every child pornography case. (Doc. No. 108 at 23-25).

Grill also submitted a sentencing memorandum expanding on her criminal history and enhancement arguments and arguing in favor of a sentence below the advisory guideline range. (Doc. No. 110). Bolinsky also chose not to raise any alleged concerns with Grill's preparation during the sentencing hearing. (Doc. No. 128 at 37).

But even if his allegations are true, Bolinsky fails to show he suffered any prejudice. The only error Bolinsky identifies is a discrepancy about his post-indictment arrest and release dates. (Doc. No. 138 at 45). I noted that inconsistency at the beginning of the sentencing hearing and clarified that Bolinsky's arrest and release occurred on the same date. (Doc. No. 128 at 3-4). Moreover, I ruled in favor of the defense on the appropriate date for the commencement of the offense conducted and sustained the defense objection to consideration of three convictions which occurred outside of the 10-year lookback period. (*Id.* at 15-17); *see also* U.S.S.G. § 4A1.1(e)(2).

Nor can Bolinsky show Grill's decision not to object to the inclusion of his December 2005 conviction for driving under the influence was objectively unreasonable. Indeed, the Sixth Circuit

---

[12]  I again point out that the Pretrial Services and Probation officer Bolinsky names in this ground – and with whom Bolinsky claims to have had a personal conversation about the PSR – did not write his PSR or the previous PSR drafted after Bolinsky's change of plea hearing, and that officer did not participate in the sentencing hearing. (*See* Doc. Nos. 48, 108, and 128).

rejected Bolinsky's challenge to the inclusion of this conviction in his criminal history calculation, holding it fell within the applicable 10-year period, and there was no error involved in counting that sentence. *United States v. Bolinsky*, Case No. 22-3185, Order dated Jan. 18, 2023, at *3.  Bolinsky has not shown he suffered any prejudice from Grill's alleged errors because he fails to show his December 2005 conviction was improperly included or that there were any unaddressed errors in the PSR. *See, e.g., Smith v. Woods*, 505 F. App'x 560, 568 (6th Cir. 2012) (rejecting habeas petitioner's allegations of error regarding presentence report because petitioner failed to show prejudice).

While Grill did not request a downward variance based upon the age of Bolinsky's December 2005 conviction, she did move for a downward variance based upon three commonly applied enhancements in child pornography cases, arguing I should utilize a guideline range of 87 to 108 months in prison rather than the computed guideline range of 235 to 240 months.  (Doc. No. 128 at 21-22, 32-33).  And I in fact varied downward substantially in sentencing Bolinsky to a term of 120 months in prison.  Bolinsky fails to show he was prejudiced by counsel's actions during the sentencing hearing. *See McQueen v. United States*, No. 19-2427, 2020 WL 3052629, at *3 (6th Cir. Mar. 25, 2020) (rejecting defendant's motion for a certificate of appealability where counsel successfully moved for a downward variance at sentencing).

I deny Bolinsky's motion as to this ground.

## I.    GROUND NINE

In Ground Nine, Bolinsky appears to assert his conviction and sentence should be vacated for ineffective assistance of trial counsel because he "was deprived of [the] effective assistance of counsel during the[se] collateral proceedings."  (Doc. No. 138 at 48).  But, as Bolinsky concedes, he has no constitutional right to counsel beyond his first appeal as of right.  Therefore, trial counsel's performance could not possibly violated his rights during collateral proceedings.  I deny his motion as to this ground.

# IV.    MISCELLANEOUS ISSUES

## A.    MOTION FOR APPOINTMENT OF COUNSEL

Several months after filing his § 2255 motion, Bolinsky filed a motion requesting the appointment of counsel.  (Doc. No. 140 at 2).

Defendants do not have a constitutional right to counsel in postconviction proceedings.  *See, e.g., Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  "Some of the factors the court should consider when making the decision to appoint counsel include the viability or frivolity of the indigent[ defendant']s claims, the nature and complexity of the case, and the indigent[ defendant']s ability to present the case."  *Sellers v. United States*, 316 F. Supp. 2d 516, 522 (E.D. Mich. 2004) (citing *McCarthy v. Weinberg*, 753 F.2d 836, 838-39 (10th Cir. 1985) (*per curiam*) and *Henry v. City of Detroit Manpower Dep't*, 763 F.2d 757, 760 (6th Cir. 1985) (*en banc*)).  I conclude the appointment of counsel is not warranted in this case because Bolinsky has shown he is able to present his arguments without the assistance of counsel and, as I discussed above, his claims lack merit.

Bolinsky also sought "assistance in procuring my trial transcripts."  (Doc. No. 140 at 1).  But Bolinsky did not follow the established process for requesting the production of transcripts at the Court's expense, either before he filed his § 2255 motion or after the government ordered the trial transcripts.  *See* 28 U.S.C. § 753(f); Loc. Cr. R. 57.20(b). (*See also* Doc. No. 147 at 28).  Therefore, I deny this request.

## B.    MOTION TO EXPAND THE RECORD

After filing his reply brief, Bolinsky filed a motion to expand the record to include other documents he asserts are relevant to this case: (1) Snyder's June 28, 2017 report regarding the Bolinsky investigation; (2) Seney's narrative supplement regarding the November 26-27, 2015 single source download; (3) Seney's initial written FTK report; (4) the certified inventory from the August 26, 2016 search of Vanderhoff's apartment; (5) a denial of Bolinsky's Freedom of Information Act

request for Snyder's notes from the August 26, 2016 interview; (6) virus research conducted by Bolinsky's sister, Neill; and (7) a screenshot of Bolinsky's Firefox browser account profile. (Doc. No. 154; Doc. No. 154-1 through Doc. No. 154-7).

The first four documents already are included as part of the record in this case. And Bolinsky fails to explain how the other documents are relevant, particularly because they are offered to support Bolinsky's incorrect representations about the facts in this case. Therefore, I deny his motion to expand the record. (Doc. No. 154).

## C.   MOTION TO SUPPLEMENT AND AMEND

Finally, over a year after he filed his § 2255 motion and nearly ten months after he filed his reply brief, Bolinsky filed a motion to supplement and amend his § 2255 motion. (Doc. No. 158). Bolinsky proposes re-arranging some of the allegations in his original motion and adding additional allegations of government misconduct. (*Id.* at 1-2).

Bolinsky fails to show any of his purportedly new allegations would give merit to any of his existing claims. Moreover, as the government notes, permitting Bolinsky to amend his motion by moving some of his allegations to new subparagraphs would only cause additional confusion and necessitate additional briefing. Therefore, I deny his motion to supplement and amend his § 2255 motion. (Doc. No. 158).

## D.   REQUESTS FOR EVIDENTIARY HEARING

Bolinsky repeatedly asserts he is entitled to an evidentiary hearing on his claims for relief. But a defendant is not entitled to an evidentiary hearing when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). That condition is true in this case, as none of Bolinsky's grounds for relief have merit. Therefore, I deny his request for an evidentiary hearing.

### E.    CERTIFICATE OF APPEALABILITY

A habeas corpus petitioner is not entitled to a certificate of appealability as a matter of right but must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner need not demonstrate he should prevail on the merits.  Rather, the petitioner must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

For all the reasons set forth above, I conclude reasonable jurists could not disagree with my resolution of Bolinsky's constitutional claims and decline to issue a certificate of appealability.

### V.    CONCLUSION

For these reasons, I deny Bolinsky's § 2255 motion.  (Doc. No. 138).  I also deny his motions to appoint counsel, to expand the record, and to supplement and amend his § 2255 motion, as well as his request for an evidentiary hearing.  (Doc. Nos. 140, 154, and 158).  Further, I deny his motions for release on bail.  (Doc. Nos. 150 and 163).  Finally, I decline to issue a certificate of appealability.


So Ordered.


                                  s/ Jeffrey J. Helmick
                                    United States District Judge